IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: <br><br> WYNNE TRANSPORTATION HOLDINGS, LLC, *et al.*,[1] <br><br>                    Debtors. | Chapter 11 <br><br> Case No. 25-10027 (KBO) <br><br> (Joint Administration Requested) |

**DECLARATION OF M. BENJAMIN JONES IN SUPPORT
OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, M. Benjamin Jones, hereby declare under penalty of perjury that the following is true and correct:

1.  I am a Senior Managing Director with Ankura Consulting Group ("Ankura Consulting"). I have more than 25 years of financial restructuring, interim management, turnaround, and financial advisory experience across a number of industries. I have served as president, chief restructuring officer, and chief financial officer for private and public companies. In addition, I have also played key roles in dozens of other high-profile restructurings and reorganizations, assisting clients both in and outside of chapter 11, including, among others, Gulf Coast Health Care, LLC, Balducci's New York LLC, High Ridge Brands Co., Trident Holdings, Mariner Post-Acute Networks, Centennial Healthcare, World Health Alternatives, The Penn Traffic Company, Milacron, Lionel, Caraustar Industries, Golden Books Family Entertainment, and Signature Healthcare. I have acted as financial advisor to companies, lenders, boards of directors and/or principal shareholders of numerous businesses. Prior to joining Ankura, I began

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Wynne Transportation Holdings, LLC (0566), Wynne Transportation, LLC (8255), Coastal Crew Change Company, LLC (9550), WTH Commercial Services, LLC (9379), Southwest Crew Change Company, LLC (8777), Great Plains Crew Change Company, LLC (5926), and Allegheny Crew Change Company, LLC (9234). The Debtors' address is 14110 N. Dallas Parkway, Suite 240, Dallas, Texas 75254.

{1468.001-W0079315.}　　　　　　　　　　　　　　1

my career at Ernst & Young, focusing on valuations and middle-market corporate finance transactions and later joined CDG Group to focus on restructurings and reorganizations.

2.      On November 19, 2024, Wynne Transportation Holdings, LLC ("Holdings") and its subsidiaries (collectively, the "Debtors") retained Ankura Capital Advisors ("Ankura Capital") to provide certain advisory services with respect to debt financing options the Debtors might pursue given the outcome of the Getz Litigation and entry of the Arbitration Award (each as defined below). On December 16, 2024, the Debtors retained Ankura Consulting to provide restructuring services, including serving as Chief Restructuring Officer to the Debtors and additional support necessary to prepare for and assist in the prosecution of a chapter 11 bankruptcy (if such was ultimately deemed necessary). The Debtors' board of managers appointed me as Chief Restructuring Officer on January 10, 2025. I submit this declaration (the "Declaration") to assist the Court and parties-in-interest in gaining an understanding of the circumstances that led to the commencement of these chapter 11 cases (collectively, the "Chapter 11 Cases") and in support of the Debtors' petitions and motions requesting various types of "first-day" relief (collectively, the "First Day Motions"). I am authorized by the Debtors to submit this Declaration.

3.      Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents and information, my discussions with members of the Debtors' senior management team, and information provided to me by the Debtors' professional advisors. If I were called upon to testify, I would testify competently to the facts set forth herein.

4.      On January 10, 2025 (the "Petition Date"), each of the Debtors filed voluntary petitions with the Court for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their

properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. The Debtors have filed a motion seeking joint administration of the Chapter 11 Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  No trustee or examiner has been appointed in these Chapter 11 Cases, and as of the date hereof, no official committee of unsecured creditors has been appointed.

5. Part I of this Declaration provides an overview of the Debtors' business and capital structure.  Part II provides a discussion of the events leading to the commencement of the Chapter 11 Cases and the Debtors' prepetition restructuring efforts.  Part III sets forth the Debtors' plan for these Chapter 11 Cases and Part IV affirms and incorporates the facts that support the relief requested in the First Day Motions.

## PART I

### OVERVIEW OF THE DEBTORS' BUSINESSES AND CAPITAL STRUCTURE

**A.    Business Operations**

6. Wynne Transportation Holdings, LLC was formed in Delaware on January 2, 2019 and is headquartered in Dallas, Texas.  The Debtors maintain operating facilities in Orange, Texas; Butler, Pennsylvania; Lake Charles, Louisiana; Gillette, Wyoming; and Elko, Nevada.  Holdings serves as a holding company of its wholly owned subsidiaries: Wynne Transportation, LLC ("Transportation"); WTH Commercial Services, LLC ("WTH"); Costal Crew Change Company LLC ("Costal"), Southwest Crew Change Company, LLC ("Southwest"), Great Plains Crew Change Company, LLC ("Great Plains") and Allegheny Crew Change Company, LLC ("Allegheny," and collectively with Transportation, WTH, Coastal, Southwest and Great Plains, the "Operating Subsidiaries").  The Debtors do business and operate under the banner of U.S. Crew Change.

7. The Debtors specialize in providing turnkey ground transportation solutions for industries such as liquid natural gas, clean energy and petrochemical, mining and traditional oil and gas projects. To that end, the Debtors maintain a fleet of vehicles to provide transportation solutions to its customers. The Debtors' 315 vehicle fleet includes 178 owned vehicles and 137 leased vehicles. Except as described below, the owned vehicles are owned outright and are not financed through secured lending facilities.

8. The Debtors generally operate four service lines within their business:

   i. <u>Industrial Employee Transportation</u>. Customized transit services for employees, focusing on safety and reliability.
   ii. <u>Turnaround Shuttle Services</u>. Efficient shuttle operations for short term projects, aimed at minimizing downtime.
   iii. <u>Special Needs Government Ground Transportation</u>. Rapid-response services for evacuations during emergencies, including natural disasters, ensuring swift and safe relocation of personnel.
   iv. <u>On-Site Shuttles</u>. Effective on-site transportation solutions, including plant shuttles, to reduce congestion and enhance operational efficiency.

9. The Debtors historically have produced strong operational results, with approximate average annual revenue and EBITDA of $78 million and $17 million respectively from 2021–2023.

B. **The Debtors' Capital Structure**

*Assets*

10. As of the Petition Date, the Debtors' assets are comprised primarily of (a) owned vehicles; (b) accounts receivable; and (c) inventory. The Debtors' owned vehicles have an estimated sale value of approximately $22.3 million in total. Current accounts receivable are approximately $4.3 million and the Debtors' inventory is valued at approximately $0.9 million.

11. As of the Petition Date, the Debtors have approximately $170,000 in cash on hand.

*Secured Debt*

12. On January 31, 2019, the Debtors entered into a Loan Agreement with LexacyTexas Bank[2] (as subsequently amended, the "Prosperity Loan Agreement") which provided the Debtors with a (a) revolving credit line of $1 million; (b) term loan of $6.250 million; and (c) standby letter of credit in the amount of $1 million.  The Prosperity Loan Agreement has been amended on nine occasions.  Most recently, the Debtors and Prosperity entered into that certain Ninth Amendment and Joinder to Loan Agreement and Other Loan Documents, dated November 16, 2024.  Except with respect to the standby letter of credit used to support insurance programs, the Debtors have no ability to borrow under the Prosperity Loan Agreement.

13. Due to the Debtors' liquidity constraints as described below, on January 3, 2025, the Debtors, Gemini Investors VI, L.P. and John Montgomery entered into that certain Term Loan Agreement (the "Gemini Term Loan").  The Gemini Term Loan is a $1 million, one year term loan that is fully subordinated to the obligations arising under the Prosperity Loan Agreement.  The obligations under the Gemini Term Loan are secured by subordinated liens on substantially all of the Debtors' assets.

*Unsecured Debt*

14. As of the Petition Date, the Debtor estimate that their unsecured debt totals approximately $36 million, consisting of litigation judgments, contractual obligations and trade debt.

---

[2] Prosperity Bank is the successor in interest to LegacyTexas Bank and the current lender under the Prosperity Loan Agreement.

*Equity*

15. The equity owners of Holdings are Gemini Investors VI, L.P. (90%); Bedford Wynne (9.1%) and John Montgomery (0.9%). Holdings owns 100% of the equity of each the Operating Subsidiaries.

## PART II

## EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

**A.   Getz Contract, Litigation and the Arbitration Award**

16. The Debtors were parties to that certain Transportation Services Agreement dated as of May 15, 2020 (the "Getz Agreement") by and between Wynne Transportation, LLC and GETZ Transport Solutions, LLC ("GETZ"). Pursuant to the Getz Agreement, the Debtors contracted with GETZ for certain transportation services and administrative support thereto in GETZ's capacity as a subcontractor. Effectiveness of the GETZ Agreement was contingent upon the Debtors' successful bid, and subsequent entry into, a contract with the State of Texas for certain transportation services.

17. On August 25, 2020, the Debtors entered into Contract No. 958-M1 by and between the Texas Comptroller of Public Accounts and Wynne Transportation, LLC (the "TDEM Contract"). Pursuant to the TDEM Contract, the Debtors provided certain emergency transportation services for the Texas Department of Emergency Management.

18. On January 23, 2023, the Debtors sent GETZ a letter advising that they were terminating the GETZ Agreement. On April 5, 2023, GETZ initiated arbitration proceedings in Dallas, Texas against the Debtors alleging breach of the GETZ Agreement and fraud, including fraud by non-disclosure. *See GETZ Transport Solutions, LLC v. Wynne Transportation, LLC, et al.*; JAMS Arbitration, Reference No. 5310000373 (the "Arbitration").

19. The Arbitration commenced on June 4, 2024 and on July 16, 2024, the arbitrator issued an Interim Award in favor of GETZ. The Arbitrator concluded that no good cause existed for the Debtors to terminate the GETZ Agreement and, therefore, the January 2023 termination letter to GETZ constituted a material breach of the GETZ Agreement. The Arbitrator further concluded that there was insufficient evidence to support a finding of fraud, to conclude that Wynne owed GETZ any fiduciary obligation, or that Wynne failed to disclose relevant information that was otherwise unknown.

20. Following the proceedings, the Arbitrator awarded GETZ damages in the amount of $32,122,931, plus arbitration costs, reasonable and necessary attorney's fees, and expert fees in the total amount of $700,000 (the "Arbitration Award"). Post-award interest at the rate of 8.50% compounded annually continues to accrue on the Arbitration Award. On October 15, 2024, the Arbitrator entered the Amended Final Award in favor of GETZ.

21. Following entry of the Arbitration Award, GETZ and Wynne attempted to reach a consensual resolution of the Arbitration Award via mediation. The mediation was unsuccessful. Notwithstanding, and during the course of the mediation, GETZ continued to litigate with the Debtors and their equity owners. For example, on October 2, 2024, GETZ filed *GETZ Transport Solutions, LLC's Original Petition and Application for Security During Arbitration, Temporary Restraining Order, and Temporary Injunction* (the "First Injunction Application"), seeking to obtain $16 million in security in the form of a bond, letter of credit, or deposit into the Texas Business Court, First Division's (the "Texas Business Court") registry, as well as an injunction under various state and federal laws. On October 9, 2024, GETZ filed its *First Amended Petition and Application for Security, Temporary Restraining Order, and Temporary Injunction* (the "Amended Injunction Application") and on November 3, 2024 filed the *GETZ Transport*

Case 25-10027-KBO    Doc 10    Filed 01/13/25    Page 8 of 19

*Solutions, LLC's Second Amended Petition and Application for Security and Temporary Injunction* ("Second Amended Injunction Application" and together with the First Injunction Application and Amended Injunction Application, the "GETZ Injunctive Relief Requests"). The Texas Business Court has denied each of the GETZ Injunctive Relief Requests.

22. On December 6, 2024, GETZ filed an *Application for Turnover Relief* (the "Turnover Action") in the District Court of Harris County, Texas, 234th Judicial Division (the "Harris County Court"). Among other things, the Turnover Action seeks a judicial determination that the Debtors (i) turn over all cash to the Harris County Court; (ii) turnover all claims and causes of action against the Debtors' managers and members to GETZ; and (iii) enjoin the Debtors from selling assets outside of the ordinary course of business until the Arbitration Award is satisfied.

23. On December 12, 2024, the Harris County Court entered judgment for GETZ against the Debtors on account of the Arbitration Award. A hearing on the Turnover Action is currently scheduled for January 13, 2025.

**B.      Business Disruptions and Liquidity Constraints**

24. In the months leading up to the filing of the Chapter 11 Cases, the Debtors attempted to reach a resolution with GETZ that would settle the disputes among the parties and satisfy the Arbitration Award. The Debtors attempted to engage in multiple rounds of mediation with GETZ, to no avail. Compounding the challenges posed to the Debtors' business as a result of the GETZ Litigation, the Debtors have suffered operational setbacks that drastically affected their business operations and short-term liquidity.

25. In particular, the Debtors are party to two significant contracts (50% of projected revenue for FY 24) whose start dates were delayed from Q3 2024 to Q1 2025. Specifically, the Debtors are counterparties to contracts to provide transportation solutions related to the build-out

{1468.001-W0079315.}                                                      8

of a gas import terminal in Sabine Pass, Texas (the "Sabine Pass Contract"). The start date for the Sabine Pass Contract is scheduled for Q1 2025. Likewise, the Debtors are a counterparty to contracts related to the construction of the Calcasieu Pass 2 LNG Terminal in Cameron Parish, Louisiana (the "CP2 Contract"). The delays on the Sabine Pass and CP2 Contracts, along with fees related to the GETZ Litigation, reduced the Debtors' cash position to the point where the Gemini Term Loan was the Debtors' only path to enable the Debtors to reach the Petition Date, file these Chapter 11 Cases and enter into the DIP Facility (as defined below).

## PART III

## THE PROPOSED RESTRUCTURING PROCESS

26. The Debtors commenced these Chapter 11 Cases to provide them with the tools necessary to resolve disruptions to their business as a result of the GETZ Litigation, engage in a restructuring of their balance sheets, effectuate a restructuring transaction that will maximize value for all of the Debtors' stakeholders and preserve the Debtors' business as a going concern in the face of an adverse judgment that the Debtors presently cannot satisfy.

27. To that end, the Debtors have negotiated and agreed to the Senior Secured Superpriority DIP Financing Term Sheet (the "DIP Facility") with Gemini Investors VI, L.P. (the "DIP Lender"). The DIP Facility will provide the Debtors with $5 million in incremental liquidity that, in combination with dramatically increased revenue from the Sabine Pass and CP Contracts, will allow the Debtors to finance the administrative costs of the Chapter 11 Cases, stabilize their business and evaluate the best possible restructuring transaction(s) to provide the maximum benefit to all of the Debtors' stakeholders.

28. The Debtors intend to consult with all of their stakeholders, including any statutory committee that is formed in these Chapter 11 Cases, to formulate an exit to the restructuring so the

Debtors' business can continue to thrive. The Debtors anticipate that such a decision on the choice of transaction will be decided as soon as possible after the Petition Date, taking into account the views of the Debtors' stakeholders.

## PART IV

## FACTS IN SUPPORT OF THE FIRST DAY MOTIONS[3]

### A.     First Day Motions – Generally

29.    To minimize the adverse effects of the commencement of these Chapter 11 Cases on the Debtors' ability to effectuate a timely and efficient restructuring process to preserve and maximize the value of the Debtors' estates for the benefit of their creditors, the Debtors have filed the following First Day Motions:

- *Motion of the Debtors for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases*;

- *Application of Debtors for Entry of an Order (I) Authorizing and Approving the Appointment of Omni Agent Solutions, Inc. as Claims and Noticing Agent and (II) Granting Related Relief*;

- *Motion of the Debtors for Entry of an Order (I) Modifying Certain Procedural Requirements Relating to the Form, Maintenance, and Filing of Certain Creditor Lists; (II) Approving the Form, Manner, and Proposed Service of the Notice of the Commencement of the Debtors' Chapter 11 Cases; (III) Approving the Redaction of Certain Personally Identifiable Information for Individual Creditors; and (IV) Granting Related Relief*;

- *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Tax and Fee Obligations and (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers*;

---

[3] Capitalized terms used but not defined in each of the succeeding subsections shall have the meanings ascribed to them in the relevant First Day Motion.

{1468.001-W0079315.}                                             10

- *Motion of the Debtors for Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Existing Insurance Policies and Premium Financing Agreements, (B) Pay All Policy Premiums Arising Thereunder and (C) Renew or Enter into New Insurance Policies or Premium Financing Agreement and (II) Granting Related Relief;*

- *Motion of the Debtors for Entry of Interim and Final Orders (A) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment;*

- *Motion of the Debtors for Entry of Interim and Final Orders, Pursuant to Sections 105(a), 363(b), 503(b), 1107(a), and 1108 of the Bankruptcy Code, (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (III) Granting Related Relief* (the "<u>Critical Vendor Motion</u>");

- *Motion of the Debtors for Entry of an Order (A) Authorizing the Maintenance of Bank Accounts and Continued Use of Company Credit Cards and Existing Business Forms and Checks, (B) Authorizing the Continued Use of Existing Case Management System and Granting Administrative Expense Status to Postpetition Intercompany Claims, (C) Granting Limited Relief from the Requirements of Bankruptcy Code Section 345(b), and (D) Granting Related Relief;*

- *Motion of the Debtors for Entry of Interim and Final Orders Authorizing the Debtors to Pay Prepetition Wages, Compensation, Employee Benefits and Other Associated Obligations;* and

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (a) Obtain Postpetition Financing on a Secured, Superpriority Basis and (b) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* (the "<u>DIP Motion</u>").

30.  I have reviewed each of the First Day Motions filed contemporaneously herewith (including the exhibits thereto and supporting memoranda) and incorporate by reference the factual statements set forth therein. It is my belief that the relief sought in each of the First Day Motions is tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to achieve a successful reorganization.

**B.      First Day Motions – The Prepetition Claim Motions**

31.     The First Day Motions request immediate authority to pay certain prepetition claims. I understand that rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty-one (21) days following the filing of a chapter 11 petition, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have narrowly tailored their requests in the First Day Motions to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Other relief will be deferred for consideration at a later hearing. It is my belief that the relief requested in the First Day Motions is both essential to maintain the value of the Debtors' businesses as a going concern and necessary to avoid immediate and irreparable harm to the Debtors and their employees, customers.

32.     For example, with respect to the Critical Vendor Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to pay prepetition claims by Critical Vendors in an amount not to exceed $375,000 on an interim basis and final basis. The Critical Vendor Claims include claims of certain vendors who are critical to the Debtors' continued business operations.

*Critical Vendor Claims*

33.     In the ordinary course of business, the Debtors engage the Critical Vendors to provide various goods essential to their business operations. The Critical Vendors include companies that are key suppliers of equipment and goods. Any interruption to the timely delivery of supplies could have a material impact on the Debtors' business, financial condition and results of operations. The Debtors have good business relationships with these suppliers, but a change in purchase patterns, and/or delays in payment for products or services to one or more of these parties could have a material negative impact on the Debtors' business, financial condition and results of

operations. The Debtors' business depends on the Debtors' ability to retain their Critical Vendors and continue to service its customers. To preserve the value of their business for the benefit of all stakeholders, the Debtors need to be able to assure their customers, vendors, services providers, and employees that they will continue to operate at the highest level and in accordance with their historical business practices, notwithstanding the filing of the Chapter 11 Cases.

34. To identify the Critical Vendors, the Debtors (with my and Ankura Consulting's assistance) have reviewed their accounts payable and prepetition vendor lists to identify those creditors most essential to the Debtors' operations pursuant to the following criteria: (a) whether there is an alternative source for the goods or services that can be acquired within a reasonable amount of time; (b) whether there is a unique process or special knowledge of the Debtors that the vendor has possessed over time that no one else has; and (c) whether a vendor meeting any of the foregoing criteria is able or likely to refuse to provide goods or services to the Debtors postpetition if its prepetition balances are not paid.

35. In many instances, the Critical Vendors provide goods unique to the Debtors that could not be easily or quickly obtained from another vendor or are sole-source providers. Although certain of these goods provided by the Critical Vendors could be obtained elsewhere, I (after discussion with the Debtors) do not believe that alternative providers could be found within a reasonable amount of time.

36. Accordingly, it is essential that the Debtors be able to maintain their business relationships with, and honor outstanding payment obligations to, the Critical Vendors given the critical role that they play in the Debtors' business. To prevent the commencement of the Chapter 11 Cases from causing an interruption to their business operations, the Debtors seek to

pay Critical Vendor Claims as part of the Critical Vendor Motion to ensure the Debtors' continued receipt of goods and favorable credit terms from the Critical Vendors.

37.     I believe that as of the Petition Date, the aggregate amount of Vendor Claims totals approximately $375,000, all of which will become due within the first twenty-one (21) days of the Chapter 11 Cases.

**C.     The DIP Motion**

38.     The Debtors have secured a debtor-in-possession credit facility in a maximum principal amount of up to $6 million (the "DIP Facility"), which will ensure that they have access to the funds necessary to maintain the stability of their business operations. The use of cash collateral alone would be insufficient to meet the Debtors' postpetition liquidity needs and provide assurances to customers and suppliers, which are necessary to maintain the value of the Debtors' business and, ultimately, effectuate a successful reorganization.

39.     To continue operating in the ordinary course while formulating a restructuring transaction, the Debtors need access to liquidity. The Debtors will obtain this liquidity from the DIP Facility. The Debtors' decision to proceed with the DIP Facility comes after a dedicated and diligent search for other available and better financing alternatives. The DIP Facility is the best available source of financing and provides the Debtors with the liquidity they need to operate during these cases. The DIP Facility was negotiated at arm's length on terms that are reasonable. Thus, to ensure the Debtors' access to liquidity that will provide the foundation for maximizing value for all stakeholders, the DIP Facility should be approved.

40.     An immediate and critical need exists for the Debtors to obtain funds in order to continue the operation of their businesses and provide the appropriate comfort to suppliers, customers and employees. The Debtors are unable to obtain the required funds (i) in the forms of (w) unsecured credit or debt allowable under section 503(b)(1) of the Code, (x) an administrative

expense pursuant to section 364(a) or (b) of the Code, (y) unsecured debt having the priority afforded by section 364(c)(l) of the Code or (z) debt secured only as described in section 364(c)(2) or (3) of the Code or (ii) on terms more favorable than those offered by the DIP Lender under the Debtors' budget (the "<u>DIP Budget</u>"), the DIP Term Sheet and the Order. The Debtors' need is immediate because the Debtors' existing cash flow is insufficient to fund the Debtors' operations in the short term.

41.     The Debtors have requested that, pursuant to the terms of the DIP Term Sheet, the DIP Lenders make loans and advances and provide other financial accommodations to the Debtors. The ability of the Debtors to continue to operate their businesses depends upon the Debtors obtaining such financing. The DIP Lenders are willing to make such loans and advances and provide such other financial accommodations on a secured basis, as more particularly described herein, pursuant to the terms and conditions of the DIP Loan Agreement. Accordingly, the relief requested in this Motion is necessary, essential and appropriate for the continued operation of the Debtors' businesses, the management and preservation of their assets and properties, the satisfaction of all regulatory requirements, and is in the best interests of the Debtors, their estates and creditors.

42.     The terms of the DIP Facility have been negotiated at arms' length and in "good faith," as that term is used in section 364(e) of the Code, and are in the best interests of the Debtors, their estates and creditors. The DIP Lender is extending financing to the Debtors in good faith and the DIP Lender is entitled to the benefits of the provisions of section 364(e) of the Code. The DIP Term Sheet was approved by the Debtors' Independent Restructuring Manager.

43.     It is in the best interests of the Debtors' estates that they be allowed to finance their operations under the terms and conditions set forth herein. The relief requested by this Motion is

necessary to avoid harm to the Debtors' estates, and good, adequate and sufficient cause has been shown to justify the granting of the relief requested herein, and the immediate entry of the Interim Order.  The terms of the DIP Facility and the use of cash collateral are fair and reasonable under the facts and circumstances of the Chapter 11 Cases, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration.

44. For the foregoing reasons, I submit that the relief requested in the DIP Motion is in the best interests of the Debtors' estates.

### The Debtors' Efforts to Obtain DIP Financing

45. The Debtors also are unable to obtain the required funds in the forms of (i) unsecured credit or debt allowable under section 503(b)(1) of the Code, (ii) an administrative expense pursuant to section 364(a) or (b) of the Code, (iv) unsecured debt having the priority afforded by section 364(c)(l) of the Code or (v) debt secured only as described in section 364(c)(2) or (3) of the Code.

46. Prior to the Petition Date, Ankura Capital, contacted one hundred thirty (130) potential lenders regarding their interest in submitting a proposal for debtor-in-possession financing. As part of its process, Ankura Capital contacted asset-based lenders, commercial finance companies and hedge funds.  The terms of the DIP Facility represent the best terms that were offered to the Debtors.

### Development of the Budget

47. To best assess the Debtors' funding needs during these Chapter 11 Cases, the Debtors have, with the assistance of their advisors, analyzed their cash needs to determine what is necessary to maintain their operations in chapter 11 and work toward a successful reorganization.

In undertaking this analysis, the Debtors and their advisors have considered the Debtors' near-term projected financial performance and the opportunities and cost to better optimize the Debtors' operations. The Debtors' management also conferred with key operational divisions to understand both the near and long-term performance and opportunities.

48. As part of the Debtors' financial review and analysis, the Debtors developed a cash flow forecast that takes into account anticipated cash receipts and disbursements during the projected period. This forecast considers a number of factors, including the impact of the chapter 11 filing, anticipated customer receipts, the cost of necessary goods and materials, required vendor payments and other material cash disbursements, cash flows from the Debtors' ongoing operations and the expenditures for which the Debtors seek authority to pay in various "First-Day" pleadings.

49. Utilizing this cash flow forecast to project their cash needs during these Chapter 11 Cases, the Debtors believe that the proposed DIP Facility will provide the Debtors with sufficient liquidity to fund the Debtors' operations during the early stage of these Chapter 11 Cases. The immediate availability of the DIP Facility is necessary to support operations and provide assurance of payment to employees and trade vendors. Without such assurances, trade vendors may very well refuse to provide goods and services to the Debtors and/or require cumbersome credit terms, which could negatively affect the Debtors' reorganization efforts and the Debtors' bankruptcy estates as a whole.

50. The Debtors (in consultation with their advisors) have determined that (i) the Budget is reasonable and will allow the Debtors to operate in the Chapter 11 Cases; and (ii) the Budget includes all reasonable, necessary, and foreseeable expenses to be incurred for the period set forth in the Budget.

## PART V

## CONCLUSION

51.     Impairment of the Debtors' business operations, or of their relationships with their employees, customers, or vendors—at the very time when the continuance of those operations and the dedication, confidence, and/or cooperation of those constituencies is most critical—would hamper the Debtors' chances of maximizing the value of its assets for the benefit of its stakeholders, whether via a sale transaction (or a series of such transactions) or a reorganization. The Debtors operate in a highly competitive sector of the domestic economy.  Any impediment to the Debtors' ability to maintain their operations in the ordinary course will have an immediate and irreparable negative impact upon the going concern value of the estates to the detriment of the Debtors' stakeholder constituencies.  I believe that payment of those selected prepetition claims identified in the First Day Motions will forestall such irreparable harm and that all creditors of the Debtors will ultimately benefit from the relief requested therein.

52.     The Debtors' ability to maximize the value of their estates depends in large part upon maintaining vendor, customer, and employee confidence and maintaining the operation of their businesses throughout the course of these proceedings.  Accordingly, the Debtors have an immediate need to continue the orderly operation of their businesses by securing goods and paying employees in the normal course thereof.  The Debtors' continued operations will enable the Debtors to preserve the going concern value of their estates and re-establish any lost vendor and customer confidence, thereby maximizing recoveries for the Debtors' stakeholders.  Further, I believe that such relief will enable the Debtors to stabilize their operations and ultimately, in conjunction with a sale (or a series thereof) or a reorganization, capture as much value as possible for the benefit of their stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: January 13, 2025                */s/ M. Benjamin Jones*
M. Benjamin Jones
Chief Restructuring Officer
On behalf of the Debtors and Debtors-In-Possession