## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| WYNNE TRANSPORTATION HOLDINGS, LLC, *et al.*,[1] | Case No. 25-10027 (KBO) |
| Debtors. | (Joint Administration Requested) |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING ON A SECURED, SUPERPRIORITY BASIS, AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") hereby file this motion (this "Motion")[2] for entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim Order"), and a final order (the "Final Order," and together with the Interim Order, the "DIP Orders"), pursuant to sections 105(a), 361, 362, 363, 364, 503, 506, 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules"). In support of this Motion, the Debtors submit the *Declaration of  M.*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Wynne Transportation Holdings, LLC (0566), Wynne Transportation, LLC (8855), Coastal Crew Change Company, LLC (9550), WTH Commercial Services, LLC (9379), Southwest Crew Change Company, LLC (8777), Great Plains Crew Change Company, LLC (5926), and Allegheny Crew Change Company, LLC (9234). The Debtors' address is 14110 N. Dallas Parkway, Suite 240, Dallas, Texas 75254.

[2] Capitalized terms used but otherwise not defined herein shall have the meanings ascribed to them in the Interim Order or the DIP Term Sheet (as defined below), as applicable. In the event there is any inconsistency between the meaning of a capitalized term in this Motion, on the one hand, and in the Interim Order or the DIP Term Sheet, on the other, the meaning in the Interim Order or DIP Term Sheet shall govern.

Benjamin Jones in Support of Debtors' Chapter 11 Petitions and First Day Motions (the "First Day Declaration") and the *Declaration of Matthew Lapish in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (a) Obtain Postpetition Financing on a Secured, Superpriority Basis and (b) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* (the "Lapish Declaration"), filed contemporaneously herewith.  In further support of this Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.     As described in the First Day Declaration, the Debtors have faced significant challenges in the months leading to the Petition Date.  To continue operating in the ordinary course throughout these Chapter 11 Cases, the Debtors require immediate access to additional financing.  Accordingly, the Debtors now seek authorization to enter into the DIP Facility and continue using Cash Collateral, subject to the terms and conditions of the DIP Orders and the DIP Term Sheet.

2.     Prior to the Petition Date, the Debtors engaged in good faith, arm's-length negotiations with the Prepetition Secured Parties (as defined herein) regarding the terms of the DIP Facility, which consists of (i) a new money term loan with an aggregate principal amount of up to $5 million, *plus* applicable fees (the "New Money DIP Loans"); and (ii) a roll-up of up to $1 million (the "Roll Up DIP Loans") of the Prepetition Loans held by the DIP Lenders.

3.     The DIP Facility and the Debtors' ongoing use of Cash Collateral are critical to provide the liquidity to preserve their businesses, maintain relationships with customers, continue honoring payroll obligations, and satisfy their ongoing working capital and operational needs.

Importantly, the DIP Facility represents the best postpetition financing option currently available to the Debtors.

4.      The combination of the DIP Facility and the Debtors' authorized use of Cash Collateral represents the only viable postpetition financing path for the Debtors in the near term. While the Debtors are continuing to negotiate for additional financing sources, the relief requested by this motion is necessary to preserve the Debtors' operations and maximize the value of the Debtors' estates for the benefit of all creditors. For the reasons set forth in this Motion, the First Day Declaration, and the Lapish Declaration, entry into the DIP Facility and continued use of Cash Collateral, on the terms set forth in the Interim Order, are necessary to avoid immediate and irreparable harm and are in the best interests of the Debtors, their estates, and all stakeholders.

## JURISDICTION AND VENUE

5.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and, pursuant to Local Bankruptcy Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6.      Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The statutory and legal predicates for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014, and Local Bankruptcy Rules 4001-2 and 9013-1.

## **BACKGROUND**

8.      On January 10, 2025 (the "Petition Date"), each of the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") in the Court.  The Debtors are authorized to operate their business and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

9.      No official committee has been appointed in these Chapter 11 Cases, and no request has been made for the appointment of a trustee or an examiner.

10.      Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the filing of these Chapter 11 Cases is set forth in the First Day Declaration.

## **INTERIM RELIEF IS NECESSARY**

11.      The Debtors will not be able to meet ordinary course obligations without access to the DIP Facility and Cash Collateral during the interim period following the Petition Date.  Such access is needed to pay, among other things, wages and benefits, taxes and fees, rent, invoices for goods and services, and other obligations that will come due during the interim period. Without access to the DIP Facility and Cash Collateral, the Debtors would face immediate, material disruption to their operations and their most critical business relationships, including with their employees and vendors, to the detriment of all of their stakeholders.  Authority to enter into the DIP Facility and use Cash Collateral during the interim period is necessary to ensure that the Debtors' businesses do not face immediate and irreparable harm at the outset of these cases.

## **RELIEF REQUESTED**

12.      By this Motion, the Debtors respectfully request entry of the DIP Orders, granting, among other things, the following relief, as applicable:

(a)     Authorizing the Debtors to obtain postpetition financing on a superpriority senior secured basis in the aggregate principal amount of up to $6,000,000, *plus* applicable fees (the "DIP Facility"), on the terms and conditions set forth in the Interim Order and that certain DIP Term Sheet (the "DIP Term Sheet"), substantially in the form attached to the Interim Order as **Exhibit 1** by and among the Debtors, as borrowers, (the "Borrowers"), the DIP Representative, as administrative agent and as collateral agent (in such capacities, the "DIP Representative"), and the lenders from time to time party thereto (collectively, the "DIP Lenders", and together with the DIP Representative, the "DIP Secured Parties"), comprised of the following:

(i)     a "new money" term loan facility in an aggregate principal amount of up to $5,000,000, *plus* applicable fees and expenses (the "DIP Facility"; the commitments thereunder, the "DIP Commitments", and the term loans extended thereunder, the "DIP Loans"), pursuant to which (A) $2 million shall be borrowed in a single borrowing upon entry of the Interim DIP Order) (the "Interim DIP Loan"), and (B) an aggregate principal amount not to exceed $3 million shall be borrowed in a single borrowing on or after the entry of the Final Order (collectively, together with the Interim DIP Loan, the "DIP Loans", and, each, a "DIP Loan"), subject to the terms and conditions set forth in the Interim Order and in the DIP  Documents (including, without limitation, the Approved Budget (as defined below) and any conditions precedent to each of the DIP Loans set forth therein)); and

(ii)     conversion of up to $1,000,000 of the Prepetition Obligations (as defined below) (together with accrued and unpaid interest thereon) into a DIP Loan (such conversion, the "Roll-Up," and such converted amounts, the "Roll-Up DIP Loans"), pursuant to which up to $1,000,000 of the Prepetition obligations held by the DIP Lenders will be, upon entry of the Final Order, automatically deemed "rolled up" and converted into the DIP Facility, on a cashless dollar-for-dollar basis, and shall automatically be deemed to be substituted and exchanged for, and shall be deemed to be, Roll Up DIP Loans for all purposes hereunder as if originally funded on the Effective Date;

(b)     authorization and approval for the Debtors to: (i) execute, deliver, and perform under the DIP Term Sheet and any other agreements, instruments, and documents related thereto or in connection therewith (collectively, the "DIP Documents"); (ii) incur all obligations under the DIP Documents to the DIP Secured Parties, including the Roll-Up Loans (as defined below) (collectively, the "DIP Obligations"); and (iii) perform such other and further acts as may be necessary, required or desirable to implement and effectuate the terms of the DIP Orders, the DIP Loan Documents and the transactions contemplated hereunder and thereunder;

(c)     authorization and approval for the Debtors to grant to the DIP Secured Parties the DIP Liens (as defined below) in all DIP Collateral (as defined below), as set forth in the DIP Orders, subject to the Carve Out, and subject to the relative priorities set forth in the DIP Orders;

(d)     authorization and approval for the Debtors to grant to the DIP Secured Parties, allowed superpriority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all DIP Obligations, subject in each case to the Carve Out, as set forth in the DIP Orders;

(e)     authorization and approval for the Debtors to use the proceeds of the DIP Facility, the DIP Collateral and the Prepetition Collateral, including Cash Collateral, in accordance with the terms and conditions set forth in the Interim Order and the DIP Documents, including the Approved Budget, subject to any variances expressly permitted under the DIP Term Sheet (the "Permitted Variances");

(f)     authorization and approval of the form of adequate protection, as and to the extent set forth in the Interim Order, to the Prepetition Secured Parties to protect against any Diminution in Value of their respective Prepetition Liens in the Prepetition Collateral (including Cash Collateral);

(g)     modification or vacatur of the automatic stay imposed by section 362 of the Bankruptcy Code or otherwise, to the extent necessary, required or desirable to implement and effectuate the terms and provisions of the Interim Order and the DIP Documents, as set forth in the DIP Orders, waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the Interim Order, and providing for the immediate effectiveness of the Interim Order;

(h)     approval of certain stipulations, waivers, and releases by the Debtors with respect to, *inter alia*, (i) the DIP Secured Parties, the DIP Documents, the DIP Liens, and the DIP Obligations, (ii) subject to the terms of the DIP Orders, the Prepetition Secured Parties, the Prepetition Loan Documents, the Prepetition Liens and the Prepetition obligations;

(i)     upon entry of the Final Order, approval of the Debtors' waiver of the right to surcharge the DIP Collateral as to the DIP Lender, pursuant to section 506(c) of the Bankruptcy Code or otherwise, in each case, upon the terms set forth in the DIP Orders;

(j)     upon entry of the Final Order, approval of (i) the Debtors' waiver of the equitable doctrine of "marshaling" and other similar doctrines with respect to the DIP Collateral as to the DIP Lender, and (ii) the Debtors' waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, with respect to the DIP Collateral as to the DIP Lender, in each case, upon the terms set forth in the DIP Orders;

(k)  scheduling a final hearing (the "Final Hearing") on the Motion to consider entry of the Final Order and approving the form of notice with respect to such Final Hearing, which order shall be in form and substance and on terms and conditions acceptable in all respects to the DIP Representative; and

(l)  granting related relief.

## SUMMARY OF DIP TERM SHEET AND USE OF CASH COLLATERAL

13.  In accordance with Bankruptcy Rules 4001(b)(1) and 4001(c)(1), and Local Bankruptcy Rule 4001-2(a)(i) and (ii), a summary of certain key terms of the proposed DIP Facility and the proposed DIP Orders is set forth below (the "Rule 4001 Summary"). The Rule 4001 Summary is qualified in its entirety by reference to the applicable provisions of the proposed DIP Orders and the DIP Term Sheet, and the proposed DIP Orders will control in the event of any inconsistency between this Motion, the Rule 4001 Summary and the proposed DIP Orders and the DIP Term Sheet, as applicable. Capitalized terms used and not otherwise defined herein shall have the meanings assigned to them in the DIP Term Sheet.

| Summary of Material Terms | |
| --- | --- |
| **Borrower(s)**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Wynne Transportation Holdings, LLC, a Delaware corporation, together with each of the direct or indirect subsidiaries thereof that have commenced Chapter 11 Cases as debtors and debtors-in-possession under the Bankruptcy Code (collectively, the "Borrowers"). |
| **Lenders**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Gemini Investors VI, L.P. ("Gemini") and any other lenders party to the DIP Term Sheet from time to time (each a "DIP Lender," and, collectively, the "DIP Lenders"). For the avoidance of doubt, Gemini is the sole DIP Lender providing New Money DIP Term Loans as of the date hereof, and John Montgomery is a DIP Lender solely with respect to the Roll-Up Loans (and to the extent of his participation in the Prepetition Loans as Prepetition Lender). |
| **DIP Representative**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Gemini (in such capacity, the "DIP Representative" and, together with the DIP Lenders, the "DIP Secured Parties"). |

| Summary of Material Terms | |
|---|---|
| **DIP Facility and Borrowing Limits**<br><br>Bankruptcy Rule 4001(c)(1)(B) | A $6,000,000 senior secured superpriority debtor-in-possession term loan credit facility (the "<u>DIP Facility</u>" and the obligations thereunder, the "<u>DIP Obligations</u>"), consisting of (a) a new money term loan (the "<u>New Money DIP Term Loans</u>") to be made during the Availability Period in the aggregate principal amount of up to $5,000,000 (the "<u>DIP Commitment</u>"), of which (i) up to $2,000,000 shall be made available upon entry of the interim order approving the DIP Facility, which order shall be satisfactory to the Required DIP Lenders and the Debtors (the "<u>Interim Order</u>"), (ii) up to $3,000,000 shall be made available upon entry of the final order approving the DIP Facility, which order shall be satisfactory to the Required DIP Lenders and the Debtors (the "<u>Final Order</u>" and, together with the Interim Order, the "<u>DIP Orders</u>") and (b) upon entry of the Final Order, a deemed "roll up" on a cashless dollar-for-dollar basis of the Prepetition Loans, to be deemed incurred as of the date of entry of the Final Order (the "<u>Roll-Up Loans</u>"; the Roll-Up Loans together with the New Money DIP Term Loans, collectively, the "<u>DIP Loans</u>"); *provided* that the aggregate principal balance of all New Money DIP Term Loans shall not exceed the DIP Commitment; *provided*, *further*, that no DIP Lender shall be obligated to make New Money DIP Term Loans in an amount in excess of the portion of the DIP Commitment set forth next to such DIP Lender's name in the table set forth on <u>Exhibit A</u> thereto.<br><br>The proceeds of the New Money DIP Term Loans shall be funded into a deposit account of the Borrowers. Such account shall be subject to the DIP Liens (as defined below) in favor of the DIP Representative, which shall be perfected pursuant to the DIP Orders.<br><br>"<u>Availability Period</u>" means the period from the date of entry of the Interim Order to the earliest of (i) the Maturity Date (as defined below) and (ii) the date of termination of the DIP Facility pursuant to the terms hereof or DIP Orders. The amount of the DIP Loan to be available following entry of an interim order by the Bankruptcy Court (in a form and substance acceptable to the DIP Lender) (the "<u>Interim Order</u>") shall be $2,000,000 ; and (ii) subject to the entry of a final order by the Bankruptcy Court (in a form and substance acceptable to the DIP Lender) (the "<u>Final Order</u>"), the balance of the DIP Loan will be made available to the Borrower. |
| **Conditions of Borrowing**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Facility (and the making of each DIP Loan) shall be conditioned upon the satisfaction of conditions precedent usual for facilities and transactions of this type and appropriate in these circumstances, including:<br><br>1. The Interim Order has been entered by the Bankruptcy Court in form and substance acceptable to the Required DIP Lenders, which order remains in effect and is not the subject of a stay pending appeal; |

| Summary of Material Terms | |
|---|---|
| | 2.  With respect to the Final Order draw amount, the Debtors have secured binding commitments for Additional DIP Financing (as defined below) no later than the date of the hearing to approve the Final Order;<br><br>3.  With respect to the Final Order draw amount, the Debtors have delivered the Extended Budget (as defined below) in form and substance acceptable to the Required DIP Lenders within 21 days after the Petition Date; and<br><br>4.  With respect to the Final Order draw amount, the Final Order has been entered by the Bankruptcy Court in form and substance acceptable to the Required DIP Lenders, which order remains in effect and is not the subject of a stay pending appeal. |
| **Interest Rate**<br><br>Bankruptcy Rule 4001(c)(1)(B) | New Money DIP Term Loan: 16% per annum, paid in kind.<br><br>Roll-Up Loans: 16% per annum, paid in kind.<br><br>Default Interest Rate: 18% per annum. |
| **Maturity Date; Duration for Use of DIP Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B) | The DIP Facility shall mature one year following the Petition Date (the "Maturity Date"). |
| **Parties with an Interest in Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(i) | Prepetition Secured Parties, Prosperity Bank |
| **Purposes for Use of DIP Proceeds and Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii) | Proceeds of the DIP Facility will be used in compliance with the terms of the Approved Budget (a) to pay transaction costs, fees and expenses which are incurred in connection with the DIP Facility, (b) to pay professional fees of the Debtors and its estate and the UCC in accordance with the Approved Budget, and (c) for working capital and other general corporate purposes of the Debtors, all subject to certain restrictions to be set forth in the Interim Order or Final Order, as applicable, and the DIP Documents.<br><br>Refinance. The deemed proceeds of the Roll-Up Loans shall be used to refinance an equal amount on a dollar-for-dollar basis of the Prepetition Loans held by the DIP Lenders (or their affiliates) reducing the amount of the |

| Summary of Material Terms |
|---|

|  | "Obligations" (as defined under the Prepetition Credit Agreement, the "<u>Prepetition Obligations</u>") by such amount.<br><br>Mandatory Prepayments. The Debtors shall pay or prepay the DIP Loans and all other DIP Obligations (together with a cash reserve established by the DIP Representative to cover asserted contingent and indemnity obligations) until such obligations are paid in full immediately as follows:<br><br>(i) Except for sales of vehicles having up to $1,000,000 of appraised value contemplated by the Approved Budget (the "<u>Approved Sale</u>"), 100% of the net cash proceeds of any sale or disposition of all or any material portion of Debtors' assets pursuant to Section 363 of the Bankruptcy Code simultaneous with the consummation thereof;<br><br>(ii) 100% of the net cash proceeds of any other sale or other disposition by any Debtor of any assets, in a single transaction or series of related transactions (except for (a) de minimis asset sales approved by an order of the Bankruptcy Court that is in form and substance acceptable to the Required DIP Lenders and the Debtors; (b) the Approved Sale; or (c) sale of goods or services in the ordinary course of business); and<br><br>(iii) 100% of the net cash proceeds of extraordinary receipts (including tax refunds, indemnity payments and insurance proceeds not included as proceeds of asset dispositions but excluding sales tax receipts contemplated to be received by the Debtors as set forth in the Approved Budget) by the Debtors.<br><br>Any amounts so paid or prepaid may not be reborrowed. No reinvestment of the proceeds of any extraordinary receipts, asset sales or other proceeds described above shall be permitted without the prior written consent of the DIP Lenders. |
| **Budget**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii) | The Debtors shall prepare and deliver to the DIP Representative a 4-week cash flow forecast beginning with the week which includes the Petition Date through the fourth week thereafter showing anticipated receipts and disbursements in form and substance acceptable to the Required DIP Lenders (the "<u>Initial Budget</u>"). Within 21 days after the Petition Date, the Debtors shall prepare and deliver to the DIP Representative a subsequent budget covering the period up to the twentieth week after the Petition Date, which shall also be subject to review and approval as to form and substance by the Required DIP Lenders (the "<u>Extended Budget</u>").<br><br>The Debtors shall update the Initial Budget or the Extended Budget, as applicable, every week (as updated, the "<u>Updated Budget</u>") and report weekly on actual performance versus the Approved Budget (as defined below); <u>provided</u> that for purposes of compliance with this Term Sheet and the DIP Orders, operating disbursements, capital expenditures, non-operating disbursements (including professional fees of the Debtors and the UCC, if |

| **Summary of Material Terms** | |
|---|---|
| | any), and receipts shall be tested bi-weekly (in each case, on an aggregate basis and subject to a 20% permitted variance (a "Permitted Variance")). "Approved Budget" means, initially, the Initial Budget, and, thereafter, the most recent Updated Budget accepted by the Required DIP Lenders in writing. See Interim Order, ¶ 17. |
| **Fees** Bankruptcy Rule 4001(c)(1)(B) | Upfront Fee: An upfront fee of 2.0% on the commitment amount of the New Money DIP Term Loan shall be fully earned upon entry of the Interim Order. The Upfront Fee shall be added to the principal amount of the DIP Obligations. The Debtors shall reimburse the DIP Representative and the DIP Lenders for all reasonable and documented costs and expenses, including legal fees, financial advisor fees, and other similar fees, costs and expenses incurred in connection with the DIP Facility and the Chapter 11 Cases, whether incurred on a prepetition or postpetition basis, which shall be payable by Borrowers promptly upon written demand and without the requirement for Bankruptcy Court approval.  A copy of the summary invoice shall be provided to counsel to the Debtors, the U.S. Trustee, and counsel to the UCC, if any. No DIP Fees shall be earned on account of any of the Roll-Up Loans. See Interim Order, ¶ 37. |
| **Adequate Protection** Bankruptcy Rule 4001(b)(1)(B)(ii) | As adequate protection for any diminution of the Prepetition Secured Parties' interest in the "Collateral" (as defined in the Prepetition Credit Agreement) including without limitation any diminution resulting from the subordination of existing liens to the DIP Liens and/or the Debtors' use of cash collateral pursuant to the DIP Orders, the Prepetition Representative shall receive, for the benefit of the Prepetition Secured Parties, the adequate protection granted to the Prepetition Secured Parties (A) pursuant to the DIP Orders (which shall include, without limitation, (i) monthly payments of the reasonable fees, costs and expenses of the Prepetition Secured Parties (including professional fees), (ii)  monthly payment in cash of interest to the Prepetition Lenders at the non-default rate as in effect on the Petition Date under the Prepetition Credit Agreement, (iii) replacement liens on the DIP Collateral that shall be junior only to the DIP Liens and any Prepetition Permitted Liens, (iv) superpriority administrative expense claims with priority over any and all administrative expenses, whether heretofore or hereafter incurred, of the kind specified in sections 503(b) or 507(a) of the Bankruptcy Code, other than the superpriority administrative expense claims of the DIP Lenders and DIP Representative and the Carve-Out, subject to payment priority consistent with Section 15 of the Prepetition Credit Agreement, and  (v) an acknowledgement of the unconditional right to credit bid the Prepetition Obligations as further set forth in this Term Sheet and (B) as otherwise |

| **Summary of Material Terms** | |
|---|---|
| | required by the Bankruptcy Court pursuant to sections 361, 507, 363(e) and 364(d)(1) of the Bankruptcy Code or otherwise. <br><br> <u>See</u> Interim Order, ¶ 14. |
| **Chapter 11 Milestones** <br><br> Bankruptcy Rule 4001(c)(1)(B) | The Debtors shall conduct the Chapter 11 Cases in accordance with the following milestones (each, a "<u>Milestone</u>") and unless waived, modified or extended by the Required DIP Lenders in their sole discretion, the failure of the Debtors to meet Milestones by the applicable specified deadlines set forth therefor (the "<u>Specified Deadline</u>") shall constitute an Event of Default: <br><br> 1. No later than five (5) days after the Petition Date, the Interim Order approving the DIP Facility shall have been entered by the Bankruptcy Court; <br> 2. No later than 21 days after the Petition Date, the Debtors shall have delivered the Extended Budget in form and substance acceptable to the Required DIP Lenders; <br> 3. No later than the date of the hearing to approve the Final Order, the Debtors shall have secured not less than $5,000,000 of additional debtor-in-possession financing on terms acceptable to the Debtors and Gemini (the "<u>Additional DIP Financing</u>"); <br> 4. No later than 30 days after the Petition Date, the Final Order approving the DIP Facility shall have been entered by the Bankruptcy Court; <br> 5. No later than 45 days after the Petition Date the Borrowers' "Golden Pass" or "CP2" contract shall have commenced operations. |
| **Liens and Priorities** <br><br> Bankruptcy Rule 4001(c)(l)(B)(i) | The DIP Secured Parties shall be granted, pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, continuing, valid, binding, enforceable, non-avoidable, and automatically perfected, post-petition first priority security interests and liens (the "<u>DIP Liens</u>") on all tangible, intangible, real and personal property of the Debtors (including without limitation, all prepetition and post-petition property and assets of the Debtors and all equity interests owned by the Debtors), and all other property of the Debtors of whatever kind, nature or description, whether acquired or created prepetition or post-petition to secure the DIP Obligations, and the proceeds, rents, profits, and offspring of each of the foregoing (the "<u>DIP Collateral</u>"), other than contracts, leases and licenses solely to the extent a lien is not permitted by law to attach to such property, in which case the proceeds of such contracts, leases and other licenses shall be DIP Collateral. The DIP Liens shall be subject only to validly perfected, enforceable and non-avoidable liens (i) that were existing as of the Petition Date, (ii) to which the liens securing the obligations under the Prepetition Credit Agreement were subject (including the liens securing the First Lien Loan Agreement, as defined in the Prepetition Credit Agreement), and (iii) which are listed on a schedule to the DIP Orders (the "<u>Prepetition Permitted Liens</u>"). Notwithstanding the foregoing, the DIP Liens shall not extend to, and the DIP Collateral shall not consist of, avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents, but (subject to entry of the Final Order) shall include the proceeds therefrom, <u>provided</u>, |

| Summary of Material Terms |
|---|

|  | however, that the DIP Collateral and DIP Liens shall not extend to proceeds of avoidance actions against the DIP Representative or any of its affiliates or related parties as the same may be determined by a final order of the Court. For the avoidance of doubt, the DIP Liens shall include, and the DIP Collateral shall consist of, all motor vehicles (whether or not subject to a certificate of title) and all proceeds of real property, including non-residential leaseholds.<br><br>DIP Liens Senior to Other Liens. For the avoidance of doubt, the DIP Liens shall prime and be senior to the lien of the Prepetition Representative, for the benefit of the Prepetition Secured Parties.  The DIP Liens granted under Section 364(d)(1) of the Bankruptcy Code shall not be *pari passu* with, or subordinated to, any other liens or security interests (whether currently existing or hereafter created), subject in each case only to the Carve-Out and any Prepetition Permitted Liens.<br><br>Superpriority Administrative Expense Claim. All DIP Obligations shall also constitute allowed superpriority administrative expense claims (the "Superpriority Claims") in the Chapter 11 Cases and shall have priority over all other claims and administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code. The DIP Liens and the Superpriority Claims shall be subject to the Carve-Out (as defined below).<br><br>First Priority Liens on Unencumbered Property. Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first priority liens and security interests in all DIP Collateral, including, for the avoidance of doubt, subject to entry of the Final Order, Avoidance Action Proceeds (collectively, the "Unencumbered Property"), without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements. Notwithstanding the foregoing, the Debtors shall take all action that may be reasonably necessary or desirable, or that the Required DIP Lenders or the DIP Representative may reasonably request, to at all times maintain the validity, perfection, enforceability and priority of the security interest and liens of the DIP Representative in the DIP Collateral, or to enable the DIP Representative to protect, exercise or enforce its rights hereunder, under the DIP Orders and in the DIP Collateral, so long as the cost of maintaining or perfecting the security interest is not excessive in view of the benefits to be obtained.<br><br>See Interim Order ¶¶ 5-6. |
| **Release of Claims** | The DIP Orders shall contain releases and exculpations for the DIP Representative, each DIP Lender and the Prepetition Secured Parties (in each case, solely in such capacity), in form and substance satisfactory to each such party and the Debtors, respectively, including, without limitation, releases from any avoidance actions, in each case subject to the investigation period provided in the DIP Orders. |

| Summary of Material Terms | |
|---|---|
| Bankruptcy Rule 4001(c)(1)(B)(viii) | <u>See</u> Interim Order ¶¶ H, 43 and 50. |
| **Carve Out**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The Carve-Out shall be, collectively, (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee (the "<u>U.S. Trustee</u>") pursuant to 28 U.S.C. §1930(a), (b) reasonable fees and expenses incurred by a trustee and payable under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $25,000, and (c) subject to the Approved Budget and to the extent allowed at any time, whether by interim order, procedural order, or otherwise, unpaid fees and expenses of the professionals (including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors) retained by the Debtors (the "<u>Debtor Professionals</u>") and any official committee of unsecured creditors appointed in the Chapter 11 Cases (the "<u>UCC Professionals</u>" and together with the Debtor Professionals, the "<u>Retained Professional</u>") (collectively, the "<u>Allowed Professional Fees</u>"), that (i) are incurred on or prior to the first business day following the date of delivery of the Carve-Out Trigger Notice (as defined below), or (ii) are incurred after the first business day following the date of delivery of a Carve-Out Trigger Notice, subject to a cap of $200,000 in the aggregate for the Debtor Professionals and a cap of $50,000 in the aggregate for the UCC Professionals (the "<u>Carve-Out</u>").<br><br>On a weekly basis, budgeted fees, costs and expenses of Retained Professionals, if any, shall be funded into a segregated escrow account held in trust in an amount as set forth in the Approved Budget (the "<u>Professional Fee Reserve</u>"). Amounts funded into the Professional Fee Reserve shall be considered used by the Debtors at such time as they are deposited into the Professional Fee Reserve for distribution to Retained Professionals in accordance with orders of the Bankruptcy Court. Any amounts remaining in the Professional Fee Reserve after payment of allowed fees and expenses shall be DIP Collateral.<br><br>"<u>Carve-Out Trigger Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the DIP Representative to the Debtors' lead counsel, the U.S. Trustee, and lead counsel to the UCC (if any), which notice may only be delivered following the occurrence and during the continuation of an event of default under the DIP Facility.<br><br><u>See</u> Interim Order ¶ 35. |
| **Events of Default**<br><br>Bankruptcy Rule 4001(c)(l)(B) | Consistent with the Prepetition Credit Agreement, but in any event including the following, shall constitute an "<u>Event of Default</u>":<br><br>(i)  the entry of an Interim Order or Final Order in form and substance that is not acceptable to the DIP Representative, the Required DIP Lenders, and the Debtors; |

| **Summary of Material Terms** |
| --- |

(ii) failure by any Debtor to be in compliance in all respects with provisions of this Term Sheet, the DIP Documents and/or the DIP Orders;

(iii) any request made by the Debtors for, or the reversal, modification, amendment, stay, reconsideration or vacatur of a DIP Order, as entered by the Bankruptcy Court, without the prior written consent of the DIP Representative and each DIP Lender;

(iv) failure of any of the Milestones to be satisfied by the Specified Deadline;

(v) failure of any representation or warranty to be true and correct in all material respects (or, to the extent qualified by materiality, in all respects) when made;

(vi) the filing of any application by the Debtors (other than the application for financing provided by a third party which seeks authority to pay all of the DIP Obligations in full in cash upon entry of the order approving such financing) for the approval of (or an order is entered by the Court approving) any claim arising under Section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest or other lien in the Chapter 11 Cases which is pari passu with or senior to the DIP Liens, excluding liens arising under the DIP Orders or pursuant to any other financing agreement made with the prior written consent of the DIP Representative and each DIP Lender;

(vii) the commencement of any action by the Debtors or other authorized person (other than an action permitted by the DIP Orders) against any of the DIP Representative or any DIP Lender or any of their agents and employees to subordinate or avoid any liens made in connection with the DIP Orders;

(viii)        (1) the Debtors file a pleading in any court seeking or supporting an order to revoke, reverse, stay, vacate, amend, supplement or otherwise modify any DIP Order, the DIP Documents, or this Term Sheet or to disallow the DIP Obligations, in whole or in part, or (2) any material provision of the DIP Orders, the DIP Documents, or this Term Sheet or any other order of the Bankruptcy Court approving the Debtors' use of Cash Collateral (as defined in the DIP Orders), shall for any reason cease to be valid and binding (without the prior written consent of the DIP Representative and each DIP Lender);

(ix) the filing with the Bankruptcy Court of a motion seeking approval of a sale under Section 363 or a plan of reorganization or liquidation in the Chapter 11 Cases that, in any such case, does not provide for indefeasible payment in full in cash to the DIP Representative and the

| Summary of Material Terms |
|---|

|  | DIP Lenders of the DIP Loans and all other amounts outstanding under the Term Sheet, the DIP Documents and the DIP Orders on closing of such sale or the effective date of such plan, without the prior written consent of the DIP Representative and each DIP Lender;<br><br>(x) the appointment in the Chapter 11 Cases of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of the Debtors (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code);<br><br>(xi) the granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the Chapter 11 Cases with respect to any portion of the DIP Collateral exceeding $150,000 in value in the aggregate;<br><br>(xii) the failure to pay (a) principal, or (b) cash interest or other DIP Obligations (in the case of this clause (b), subject to a three (3) business day grace period) in full when due, including without limitation, on the Maturity Date;<br><br>(xiii)      the payment of, or application by the Debtors for authority to pay, any prepetition claim without prior written consent of the DIP Representative and the Required DIP Lenders other than amounts set forth in the Approved Budget (subject to any Permitted Variances); and<br><br>(xiv)      the failure to comply with the Approved Budget (subject to any Permitted Variances).<br><br><u>See</u> Interim Order ¶ 28. |
| **Waiver/Modification of the Automatic Stay**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv) | Pursuant to the Interim Order, the automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to implement and effectuate the terms of the Interim Order and the DIP Loan Documents.<br><br><u>See</u> Interim Order ¶ 20. |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens**<br><br>Bankruptcy Rule 4001(c)(1)(B)(vii) | All security interests in and liens on collateral securing the obligations under the DIP Facility shall be valid and perfected upon entry of the Interim Order.<br><br><u>See</u> Interim Order ¶ 21. |
| **Indemnification** | The Debtors shall indemnify and hold harmless the DIP Secured Parties, each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, |

| Summary of Material Terms | |
|---|---|
| Bankruptcy Rule 4001(c)(1)(B)(ix) | financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees past, present, and future, and their respective heirs, predecessors, successors and assigns in accordance with, and subject to, the terms and conditions of this Interim Order and the DIP Documents except to the extent resulting from such party's  bad faith or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction. <br><br> <u>See</u> Interim Order ¶ 39. |
| **Cross-Collateralization** <br><br> Local Bankruptcy Rule 4001– 2(a)(i)(A) | N.A. |
| **Debtors' Stipulations** <br><br> Local Bankruptcy Rule 4001– 2(a)(i)(B) | Pursuant to the Interim Order, the Debtors for themselves, their estates and all representatives of such estates, make the stipulations set forth in Paragraphs G-H  of the Interim Order. |
| **506(c) Waiver** <br><br> Local Bankruptcy Rule 4001– 2(a)(i)(C) | Subject to entry of the Final Order, the Debtors have agreed to waive the right to surcharge the DIP Collateral pursuant to section 506(c) with respect to the DIP Secured Parties and Prepetition Secured Parties. <br><br> <u>See</u> Interim Order ¶ 46. |
| **Liens on Chapter 5 Causes of Action** <br><br> Local Bankruptcy Rule 4001– 2(a)(i)(D) | Subject to entry of the Final Order, the DIP Secured Parties and Prepetition Secured Parties shall be granted valid, perfected, enforceable and non-avoidable liens on, and security interests in proceeds of Avoidance Actions. <br><br> <u>See</u> Interim Order, fn 4. |
| **Provisions Deeming Prepetition Debt to be Postpetition Debt** <br><br> Local Bankruptcy Rule 4001– 2(a)(i)(E) | Subject to entry of the Final Order, up to $1,000,000 of the Prepetition obligations (together with accrued and unpaid interest thereon) shall be converted to Roll-Up DIP Loans. <br><br> <u>See</u> Interim Order ¶ 8. |
| **Disparate Treatment of Professionals Under Carve Out** <br><br> Local Bankruptcy Rule 4001– 2(a)(i)(F) | Allowed Professional Fees of Debtors have a Post-Carve-Out Trigger Notice Cap of $200,000 and the Committee Professionals has a Post-Carve-Out Trigger Notice Cap of $50,000 <br><br> <u>See</u> Interim Order ¶ 35. |

| Summary of Material Terms | |
|---|---|
| **Non-Consensual Priming Liens**<br><br>Local Bankruptcy Rule 4001– 2(a)(i)(G) | N/A. |
| **Section 552(b)(1) Waiver**<br><br>Local Bankruptcy Rule 4001– 2(a)(i)(H) | Subject to entry of the Final Order, the Debtors have agreed that the "equities of the case" exception in section 552(b) of the Bankruptcy Code shall not apply to the DIP Secured Parties or Prepetition Secured Parties.<br><br>See Interim Order ¶ 48. |
| **Prepayment Penalties**<br><br>Local Bankruptcy Rule 4001– 2(a)(i)(I) | N/A. |
| **Payment of Lender Expenses**<br><br>Local Bankruptcy Rule 4001– 2(a)(i)(K) | The Interim Order requires the reasonable and documented fees and expenses of the law firms, financial advisors and other professionals of the DIP Secured Parties and Prepetition Secured Parties as described in the Interim Order.<br><br>See Interim Order ¶¶ 38. |
| **Limitations on Investigations of Liens**<br><br>Local Bankruptcy Rule 4001– 2(a)(i)(L) | The Interim Order prohibits the use of the financing to investigate the liens of the Prepetition Secured Parties, except for up to $25,000 of the DIP Collateral set aside for an Official Committee to investigate liens prior to the Challenge Deadline.<br><br>See Interim Order ¶ 35. |
| **Authorization of DIP Facility and DIP Loan Documents**<br><br>Local Bankruptcy Rule 4001– 2(a)(i)(R) | N/A |
| **Notice of an Event of Default**<br><br>Local Bankruptcy Rule 4001– 2(a)(i)(S) | The Interim Order provides for five (5) days' written notice of an Event of Default.<br><br>See Interim Order ¶ 30. |
| **Limitations on Arguments in the Event of a Default** | N/A. |

| Summary of Material Terms | |
|---|---|
| Local Bankruptcy Rule 4001– 2(a)(i)(T) | |
| **Marshalling Waiver** <br><br> Local Bankruptcy Rule 4001– 2(a)(i)(X) | Subject to entry of the Final Order, the DIP Secured Parties and the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as applicable. <br><br> <u>See</u> Interim Order ¶ 47. |
| **DIP Liens on Unencumbered Assets** <br><br> Local Bankruptcy Rule 4001- 1(a)(1)(G) | DIP Liens shall be valid, binding, continuing, enforceable, non- avoidable, fully and automatically perfected *pari passu* first priority liens and security interests in all Unencumbered Property, which Unencumbered Property includes motor vehicles owned by the Debtors. <br><br> <u>See</u> Interim Order fn 4. |

14.     The DIP Facility is critical to the Debtors' continuing operations and essential to facilitating the Chapter 11 Cases. In light of the foregoing, the terms of the DIP Facility are appropriate under the facts and circumstances of these Chapter 11 Cases and should be approved.

## DEBTORS' PREPETITION CAPITAL STRUCTURE

15.     ***Prosperity Loan Facility.*** On January 31, 2019, the Debtors entered into a Loan Agreement with LexacyTexas Bank[3] (as subsequently amended, the "<u>Prosperity Loan</u> <u>Agreement</u>") which provided the Debtors with a (a) revolving credit line of $1 million; (b) term loan of $6.250 million; and (c) standby letters of credit in the amount of $1 million. The Prosperity Loan Agreement has been amended on nine occasions. Most recently, the Debtors and Prosperity entered into that certain Ninth Amendment and Joinder to Loan Agreement and Other Loan Documents, dated November 16, 2024. Except with respect to the standby letter of credit used to

---

[3] Prosperity Bank is the successor in interest to LegacyTexas Bank and the current lender under the Prosperity Loan Agreement.

support insurance programs, the Debtors have no ability to borrow under the Prosperity Loan Agreement.

16.      ***Gemini Term Loan***. The Debtors are a parties to that certain Term Loan Agreement, dated as of January 3, 2025 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Credit Agreement" and the loans thereunder, the "Prepetition Loans"), by and among, *inter alia*, Wynne Transportation Holdings, LLC, a Delaware limited liability company and its subsidiaries (the "Borrowers"), Gemini Investors VI, L.P and John Montgomery as the lenders thereunder (the "Prepetition Lenders"), Gemini Investors VI, L.P., as Lender Representative (the "Prepetition Lender Representative", and together with the Prepetition Lenders, the "Prepetition Secured Parties").  The Prepetition Loans consist of a term loan in the aggregate principal amount of $1,000,000.

17.      Pursuant to the Prepetition Credit Agreement, each of the Borrowers granted to the Prepetition Lenders valid and properly perfected continuing liens and security interests in (the "Prepetition Liens") substantially all of the assets of the Borrowers,  including, without limitation, all "Collateral" (collectively, the "Prepetition Collateral").

## DEBTORS' NEED FOR CASH COLLATERAL AND DIP FINANCING

18.      As detailed in the First Day Declaration, to continue operating in the ordinary course, and to effectuate an efficient restructuring, the Debtors need immediate access to liquidity. See First Day Declaration at ¶¶ 38-40.  Not only is continued use of Cash Collateral important for the Debtors' business, but so, too, is immediate access to the funds available from the DIP Facility. Id. at ¶¶ 38-43.

19.      As part of the Debtors' financial review and analysis, the Debtors developed the Initial Budget, which is attached as **Exhibit 2** to the Interim Order. The Initial Budget incorporates a number of factors and reasonable assumptions, including the impact of the chapter 11 filing,

material cash disbursements, required vendor payments, cash flows from the Debtors' ongoing operations and the cost of necessary goods and materials and includes all of the expenditures for which the Debtors seek authority to pay in various "First-Day" pleadings.  Id. at ¶¶ 47-50.

20.     The Debtors require immediate access to the funding provided by the DIP Facility on an interim basis.  See First Day Declaration at ¶¶ 38-40.  The events leading up to the commencement of these Chapter 11 Cases have underscored the Debtors' need to access the proceeds of the DIP Facility and Cash Collateral on an interim basis.  Id. at ¶¶ 16-25.  Absent immediate access to the funds available from the DIP Facility and the Debtors' access to Cash Collateral, the Debtors will be unable to meet their postpetition liquidity needs or provide the assurances to customers and suppliers that are necessary to maintain the value of the Debtors' business, and risk eliminating their opportunity to effectuate a successful reorganization, to the detriment of all stakeholders.  Id. at ¶ 38.  Moreover, unless the Debtors can demonstrate that they have the means available to operate in the ordinary course and pay for goods and services that are vital to ongoing business operations, vendors and suppliers may refuse to do business with the Debtors.  Id. at ¶ 52. Immediate access to the DIP Facility will enable the Debtors to stabilize their businesses, maintain ordinary course operations, meet their financial commitments throughout the course of the Chapter 11 Cases, and avoid irreparable harm pending the Final Hearing.  Id. at ¶ 51.

## PREPETITION EFFORTS TO SECURE DIP FINANCING

21.     As the challenges posed by the GETZ Litigation as well as the start delays in the Sabine Pass and CP2 Contracts became more extended, the Debtors began to consider various restructuring alternatives to address these issues.  On October 30, 2024, the Debtors retained Matthew Kahn to serve as an independent restructuring manager of the Debtors (the "Independent Restructuring Manager").  The Independent Restructuring Manager has been tasked with evaluating certain claims asserted by GETZ against the Debtors' majority equity investor, Gemini,

as well as any financing or restructuring proposals that may be offered by Gemini.  Beginning in November 2024, the Debtors, with the assistance of their retained professionals, including Ankura, began a marketing process to attract debt financing for the Debtors.  Lapish Declaration, ¶ 9.

22.    Ankura reached out to over one hundred thirty (130) parties capable of providing DIP financing, with 15 parties signing NDA to evaluate the opportunity.  Given the tight timeframe and the intervening holiday schedule, extensive effort was made to secure multiple term sheets (the "Third-Party Term Sheets") for the Debtor to choose between. Ultimately, one Third-Party Term Sheet was secured and the group commenced due diligence.  Lapish Declaration, ¶ 10.

23.    By the end of December 2024, it became apparent to the Debtors and their professionals that they would need to commence the Chapter 11 Case in order to effectively restructuring their balance sheet and operations.  Because of short term liquidity constraints, the Debtors had a need for a bridge liquidity solution.  On January 3, 2025, the Debtors and Gemini Investors VI, L.P. entered into that certain Term Loan Agreement (the "Gemini Term Loan").  The Gemini Term Loan is a $1 million, one year term loan that is fully subordinated to the obligations arising under the Prosperity Loan Agreement.  The obligations under the Gemini Term Loan are secured by subordinated liens on substantially all of the Debtors' assets.  Lapish Declaration, ¶ 11. For the avoidance of doubt, however, the obligations under the Gemini Term Loan were not secured by motor vehicles owned by the Debtors.

24.    During the week preceding the Petition Date the term sheet provider pulled out of the process and Ankura contacted seven groups who had not previously been a part of the process with an additional four NDA's signed. Two of these groups provided Third-Part Term Sheets within two days of being contacted but, given the limited time the Debtors had to guarantee financing to ensure its short-term viability, Gemini put forth its own term sheet. Given the superior

terms of Gemini's DIP Facility proposal, Gemini's knowledge of the Company, and the certainty

to close in the timeframe required to provide the Debtors with critically needed liquidity, the

Independent Restructuring Manager determined that Gemini's proposal be accepted.   Lapish

Declaration, ¶ 12.

25.     Ultimately, the Debtors, in consultation with their advisors, determined that the DIP

financing proposal from Gemini reflected terms that were superior to the Third-Party Term Sheets

and, in fact, represented the only executable financing transaction available to the Debtors at this

time.  Lapish Declaration, ¶ 13.

## BASIS FOR RELIEF

**I.      The Debtors Should Be Authorized to Obtain Postpetition Financing.**

**A.      Entering into the DIP Term Sheet and Payment of Fees Thereunder is an Exercise of the Debtors' Sound Business Judgment.**

26.     The Court should authorize the Debtors, in exercising their sound business

judgment, to enter into the DIP Term Sheet, obtain postpetition DIP financing under the DIP

Facility, and continue using Cash Collateral. Courts grant considerable deference to a debtor's

business judgment in obtaining postpetition secured credit so long as the agreement to obtain such

credit does not run afoul of the provisions and underlying policy considerations of the Bankruptcy

Code. See, e.g., In re L.A. Dodgers LLC, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will

almost always defer to the business judgment of a debtor in the selection of the lender."); In re

Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan

and receivables facility because such facility "reflect[ed] sound and prudent business judgment");

In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently

reflect that the court's discretion under section 364 is to be utilized on grounds that permit

reasonable business judgment to be exercised so long as the financing agreement does not contain

terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

27.    To determine whether a debtor has met the business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006); see also In re Curlew Valley Assocs., 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

28.    Courts generally will not second-guess a debtor's business decisions when those decisions involve a minimum level of care in arriving at the decision on an informed basis, in good faith, and in the honest belief that the action was taken in the best interest of the debtor. See In re Los Angeles Dodgers LLC, 457 B.R. at 313. To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" In re Dura Auto. Sys., Inc., No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted). Further, in considering whether the terms of postpetition financings are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. In re Farmland Indus., Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

29.     The Debtors' entry into the DIP Facility represents a sound exercise of their business judgment. See First Day Declaration, at ¶ 43. The Debtors require access to the DIP Facility because (i) they require immediate access to funds, as, among other reasons, they will otherwise fall below their minimum liquidity threshold immediately in the days following the Petition Date, and (ii) it is critical for the Debtors to reassure their suppliers, customers, vendors, employees, and other stakeholders that the Debtors have adequate liquidity to fund these Chapter 11 Cases and complete their restructuring. See First Day Declaration at ¶¶ 47-50.  The terms of the DIP Facility were negotiated in good faith and at arm's length, resulting in proposed financing terms that are more favorable overall to the Debtors than the terms contained in the proposals received from the other prospective financing sources. See Lapish Declaration at ¶¶ 17-21. Accordingly, the Court should authorize the Debtors' entry into the DIP Facility as a reasonable exercise of the Debtors' business judgment.

**B.     The Debtors Should Be Authorized to Grant Liens and Superpriority Claims to the DIP Lenders.**

30.     The Debtors propose to obtain financing under the DIP Facility, in part, by providing superpriority claims and liens pursuant to section 364(c) and (d) of the Bankruptcy Code.

31.     In the event that a debtor demonstrates that it is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court:

> may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c); <u>see also</u> <u>In re Crouse Group, Inc.</u>, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

32.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing pursuant to section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

a.      the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

b.      the credit transaction is necessary to preserve the assets of the estate; and

c.      the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

<u>See</u> <u>In re Ames Dep't Stores</u>, 115 B.R. at 37–40; <u>see also</u> <u>In re St. Mary Hosp.</u>, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); <u>Crouse Group</u>, 71 B.R. at 549.

33.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, courts will consider whether (a) the debtor made reasonable efforts, but failed, to obtain unsecured credit under sections 364(a) and 364(b) of the Bankruptcy Code, (b) the credit transaction benefits the debtor as necessary to preserve estate assets, and (c) the terms of the credit transaction are fair, reasonable, and adequate, given the circumstances of the debtor and proposed lender. <u>See</u> <u>In re Republic Airways Holdings Inc.</u>, 2016 WL 2616717, at *11; <u>In re Los Angeles Dodgers LLC</u>, 457 B.R. at 312–13; <u>In re Ames Dep't Stores, Inc.</u>, 115 B.R. at 40. However, section 364 "imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." <u>Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)</u>, 789 F.2d 1085, 1088 (4th Cir. 1986).

34.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest

of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1).

35.     As such, the Debtors may incur "priming" liens under the DIP Facility if they are unable to obtain unsecured or junior secured credit and either (a) the Prepetition Secured Parties have consented or (b) the Prepetition Secured Parties' interests in collateral are adequately protected. Here, no party that the Debtors' advisors contacted as part of the above-described process was interested in providing, or willing to provide, postpetition financing to the Debtors on a junior basis. See Lapish Declaration, at ¶ 19. Accordingly, the DIP Facility' structures are appropriate in light of the Debtors' financing needs and the lack of viable non-priming debtor-in-possession financing alternatives. See Anchor Savs. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected."); see also In re El Paso Refinery, L P, 171 F.3d 249, 252 (5th Cir. 1999) (stating that priming lien given to a postpetition lender by "agreement was given a priority over the preexisting first lien of a group of Term Lenders"); In re Outboard Marine Corp., 2002 WL 571661, at *1 (Bankr. N.D. Ill. 2002) ("[T]he DIP Lenders committed to provide certain financing to the Debtors . . . pursuant to which the Prepetition Lenders consented to the imposition of priming liens upon the Prepetition Collateral and in favor of the DIP Lenders[.]"), aff'd, Bank of Am., N.A. v. Moglia, 330 F.3d 942 (7th Cir. 2003).

36.     The Prepetition Secured Parties have consented to the priming liens securing the DIP Facility.

37.     Moreover, pursuant to the DIP Orders, the Prepetition Secured Parties will receive adequate protection in the form of (i) replacement liens on any security interests in all DIP

Collateral, and (ii) superpriority administrative expense claims as contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors, among other things.

38.     As stated above, section 364(d)(1) permits the debtor to obtain postpetition financing with priming liens in the event prepetition lienholders subject to the priming are adequately protected.  Accordingly, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is both warranted and appropriate under the circumstances.

### C.     No Comparable Alternative to the DIP Facility Is Reasonably Available.

39.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. In re Snowshoe Co., Inc., 789 F.2d at 1088 (4th Cir. 1986); see also In re Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988); see also In re Snowshoe Co., 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); In re Stanley Hotel, Inc., 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); In re Ames Dep't Stores, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

40.     Here, the Debtors have made a good faith effort to seek out optimal postpetition financing arrangements to meet their short-term liquidity needs as well as their longer-term restructuring objectives.  See Lapish Declaration, at ¶¶ 9-13.  The DIP Facility constitutes the best available solution to the Debtors' financing needs because it provides an actionable path forward

in these Chapter 11 Cases.  <u>See</u> First Day Declaration  at ¶ 39.  Accordingly, the DIP Facility

represents the best option available to address the Debtors' immediate liquidity needs, and the

Debtors respectfully submit that the terms and conditions of the DIP Facility are reasonable and

appropriate under the circumstances.

### II.    The Use of Cash Collateral Is Warranted and Should Be Approved.

41.    For the reasons set forth herein, the Debtors require use of Cash Collateral as well

as the DIP Facility for the continued operation of the Debtors' businesses and smooth entry into

these Chapter 11 Cases.  Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured

creditor's cash collateral. Section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A)    each entity that has an interest in such cash collateral
> consents; or
>
> (B)    the court, after notice and a hearing, authorizes such use,
> sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).  Furthermore, section 363(e) provides that "on request of an entity that has

an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or

without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide

adequate protection of such interest." 11 U.S.C. § 363(e).

42.    The Debtors have satisfied the requirements of sections 363(c)(2) and (e) and

should be authorized to use Cash Collateral. As noted above, the Debtors intend to provide the

appropriate parties with adequate protection for the use of Cash Collateral. Further, the Prepetition

Secured Parties will inherently benefit from the Debtors' continued use of the Cash Collateral,

which will prevent avoidable diminution in value of the Cash Collateral and enhance the likelihood

of preserving the Debtors' overall value. <u>See</u>, <u>e.g.</u>, <u>495 Cent. Park Ave. Corp.</u>, 136 B.R. 626, 631

(Bankr. S.D.N.Y. 1992) (noting that, in determining whether protection is "adequate," courts

consider "whether the value of the debtor's property will increase as a result of the" use of collateral or provision of financing); In re Sky Valley, Inc., 100 B.R. at 114 ("an increase in the value of the collateral . . . resulting from superpriority financing could result in adequate protection." (citation omitted)), aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117 (N.D. Ga. 1989). Accordingly, the Court should grant the Debtors the authority to use Cash Collateral under section 363(c) of the Bankruptcy Code.

### III. The Debtors Should Be Authorized to Pay the Fees Required by the DIP Loan Documents.

43.     Under the DIP Loan Documents, the Debtors have agreed, subject to Court approval, to pay certain fees, expenses, and other payments to the DIP Representative and the DIP Lenders.  The Debtors have also agreed to pay the fees and expenses of counsel and other professionals retained by the DIP Representative and the DIP Lenders as provided for in the DIP Loan Documents.  The fees payable under the DIP Loan Documents include a 2.0% Upfront Fee on the New Money DIP Term Loans, due and payable in kind on the date of entry of the Interim Order and added to the principal amount of the New Money DIP Loans.  The DIP Loans shall bear interest at a rate per annum equal to the 16% per annum.

44.     The Debtors believe that the interest, and fees to be paid under the DIP Facility are consistent with the market and are reasonable and appropriate, particularly in light of the circumstances of these Chapter 11 Cases and the robust marketing process undertaken, and represent the most favorable terms available to the Debtors. See Lapish Declaration at ¶ 21.

### IV. The DIP Representative and the DIP Lenders Should Be Afforded Good-Faith Protections under Section 364(e).

45.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

46.     The DIP Facility (a) is the product of arm's-length, good-faith negotiation processes; (b) is the best available postpetition financing option for the Debtors in light of the facts and circumstances of the Debtors and these Chapter 11 Cases; and (c) contains reasonable and appropriate financial terms and conditions under the circumstances.  See Lapish Declaration at ¶¶ 17-21. The terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility and Cash Collateral will be used only for purposes that are permissible under the Bankruptcy Code.  Further, the Debtors ran a competitive process before selecting the DIP Lenders' proposal.  See id. at ¶¶ 10-13.  Accordingly, the Court should find that the obligations arising under the DIP Facility and other financial accommodations made to the Debtors have been extended by the DIP Representative and the DIP Lenders and the Prepetition Secured Parties in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and therefore the DIP Representative and the DIP Lenders and the Prepetition Secured Parties are entitled to all of the protections afforded thereby.

## V.    The Automatic Stay Should Be Modified on a Limited Basis.

47.     The relief requested herein contemplates a modification of the automatic stay (if applicable) to (a) permit the Debtors to grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority

of such security interests and liens, and (b) permit the DIP Representative, DIP Lenders, and the Prepetition Secured Parties to exercise rights and remedies under certain circumstances. Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these Chapter 11 Cases. See, e.g., In re Yellow Corp., No. 23-11069 (CTG) (Bankr. D. Del. Sept. 15, 2023) (modifying automatic stay as necessary to effectuate the terms of the order); In re Lannett Co., Inc., No. 23-10559 (JKS) (Bankr. D. Del. June 7, 2023) (same); In re Carestream Health, Inc., No. 22-10778 (JKS) (Bankr. D. Del. Sep. 27, 2022) (same); In re OSG Group Holdings, Inc., No. 22-10718 (JTD) (Bankr. D. Del. Aug. 9, 2022) (same); In re Armstrong Flooring, Inc., No. 22-10426 (MFW) (Bankr. D. Del. Jun. 7, 2022) (same); In re MD Helicopters, Inc., No. 22-10263 (KBO) (Bankr. D. Del. Apr. 26, 2022) (same); In re BHCosmetics Holdings, LLC, No. 22-10050 (CSS) (Bankr. D. Del. Mar. 9, 2022) (same); In re Alto Maipo Del. LLC, No. 21-11507 (KBO) (Bankr. D. Del. Dec. 17, 2021) (same). The Debtors therefore submit that the modification of the automatic stay as set forth in the DIP Orders should be approved.

**VI.    Failure to Obtain Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.**

48.    Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, the court is empowered to conduct an interim expedited hearing on the motion at which it may authorize a debtor to use cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate. See Bankruptcy Rule 4001(b)(2). Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable

likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3).

49.    The Debtors cannot continue to operate their businesses without the use of Cash Collateral.  See First Day Declaration at ¶ 39.  Additionally, immediate access to the funds available from the DIP Facility is critical to the Debtors' businesses operations at the outset of these Chapter 11 Cases.  Id. at ¶ 40. As such, the Debtors require immediate access to postpetition financing and the use of Cash Collateral to operate their businesses, preserve value, and avoid irreparable harm pending the Final Hearing.

50.    The Debtors, with the assistance of their advisors, developed the Initial Budget. First Day Declaration at ¶¶ 47-50. The Initial Budget contains line items for each category of cash flows anticipated to be received or disbursed during the time period for which the Budget is prepared. Id. The Initial Budget includes all reasonable, necessary, and foreseeable expenses to be incurred in connection with the operation of their businesses for the period set forth in the Initial Budget and establishes that the Debtors will have adequate liquidity during this interim period if allowed to utilize the Cash Collateral and access the DIP Facility.  Id.

51.    The Debtors are seeking limited relief to, among other things, satisfy payroll and contractual obligations, pay suppliers, meet overhead, and make any other payments that are essential for the continued management, operation, and preservation of the Debtors' businesses. See First Day Declaration at ¶¶ 48-49. The ability to satisfy these expenses when due is essential to the Debtors' continued operation of their businesses during the pendency of these Chapter 11 Cases. Id.

52.    Failure to obtain access to the DIP Facility and Cash Collateral will result in immediate and irreparable harm to the Debtors and their stakeholders and will diminish the value

of the Debtors' estates to the detriment of their creditors. Id. at ¶ 49. Without the approval of the DIP Facility and use of Cash Collateral, the Debtors will be unable to continue to operate in the ordinary course and preserve and maximize the value of their assets for the benefit of all parties in interest. Id.

53.     Accordingly, pursuant to section 363(c)(3) of the Bankruptcy Code and Bankruptcy Rule 4001(b), the Debtors respectfully request that the Court conduct an expedited hearing on this Motion and enter the proposed Interim Order authorizing the Debtors to enter into the DIP Facility and use Cash Collateral.

## REQUEST FOR FINAL HEARING

54.     Pursuant to Rules 4001(b)(2) and 4001(c)(2) of the Bankruptcy Rules, the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## WAIVER OF BANKRUPTCY RULES 4001 AND 6004

55.     The Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rules 4001(a)(3) and 6004(h). As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors. Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rules 4001(a)(3) and 6004(h), to the extent such stay applies.

## RESERVATION OF RIGHTS

56.     Nothing contained herein is intended or shall be construed as (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the

Debtors; (c) a waiver of any claims or causes of action which may exist against any creditor or interest holder; or (d) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

### NOTICE

57.     Notice of this Motion has been or will be provided to:  (i) the Office of the United States Trustee for the District of Delaware; (ii) the United States Attorney's Office for the District of Delaware; (iii) those creditors holding the thirty (30) largest unsecured claims against the Debtors' estates; (iv) counsel to the Prepetition Secured Parties; (v) counsel to the DIP Representative; (vi) counsel to the DIP Lenders; and (vii) the Internal Revenue Service. The Debtors will serve copies of this Motion and an order entered in respect of this Motion as required by Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

### NO PRIOR REQUEST

58.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request entry of the proposed DIP Orders granting the relief requested herein and such other and further relief as the Court may deem just and equitable.

Dated: January 13, 2025
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Joshua B. Brooks (No. 6765)
Clifford R. Wood, Jr. (No. 7130)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email:  landis@lrclaw.com
       mcguire@lrclaw.com
       brooks@lrclaw.com
       wood@lrclaw.com

*Proposed Counsel for the Debtors*
*and Debtors-In-Possession*