**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| WYNNE TRANSPORTATION HOLDINGS, LLC, *et al.*,[1] | Case No. 25-10027 (KBO) |
| Debtors. | (Joint Administration Requested) |
| | Ref. No. 13 |

**DECLARATION OF MATTHEW LAPISH IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING ON A SECURED, SUPERPRIORITY BASIS, AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF**

I, Matthew Lapish, declares as follows:

1. I submit this declaration (this "Declaration") in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (a) Obtain Postpetition Financing on a Secured, Superpriority Basis and (b) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* (the "DIP Motion")[2] filed by Wynne Transportation Holdings, LLC ("Wynne" or the "Company") and its subsidiaries that are debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Wynne Transportation Holdings, LLC (0566), Wynne Transportation, LLC (8255), Coastal Crew Change Company, LLC (9550), WTH Commercial Services, LLC (9379), Southwest Crew Change Company, LLC (8777), Great Plains Crew Change Company, LLC (5926), and Allegheny Crew Change Company, LLC (9234). The Debtors' address is 14110 N. Dallas Parkway, Suite 240, Dallas, Texas 75254.

[2] Capitalized terms that are used but not otherwise defined in this Declaration shall have the meanings ascribed to them in the DIP Motion.

{1468.001-W0079317.}

2. I am not being compensated separately for this testimony other than through payments received by Ankura Capital Advisors ("Ankura") as a professional proposed to be retained by the Debtors. Except as otherwise indicated herein, all of the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by Ankura employees working with me or under my supervision or information provided to me by the Debtors. If called upon to testify, I could and would testify to the facts set forth herein on that basis. I am authorized to submit this Declaration on behalf of the Debtors.

## PROFESSIONAL BACKGROUND AND QUALIFICATIONS

3. I am a Managing Director in the restructuring advisory group of Ankura, an investment and financial advisory firm with principal offices at 485 Lexington Avenue, New York, NY 10017, as well as at other locations worldwide. Ankura is a full-service investment banking firm providing financial advisory services, including with respect to mergers and acquisitions, capital raising, and restructuring advice, across a broad range of industries. Ankura and its senior professionals have extensive experience with respect to the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 proceedings. Ankura and its professionals are providing or have provided investment banking, financial advisory and other services in connection with the following recent cases, among others: *In re Total Auto Financing*, 23-11867 (BFK) (Bankr. E.D.Va,); *In re Black New Channel*, 22−40087 (KKS) (Bankr. N.D. Fla.); *In re Boy Scouts of America*, 2010343 (LSS) (Bankr. D. Del); *In re CarePoint Health Systems Inc.*, 24-12534 (JKS) (Bankr. D. Del.).

4. I have been employed at Ankura since January 2023. Prior to joining Ankura, I was a Director at Fairfield Capital Advisors, an independent investment bank acquired by

{1468.001-W0079317.}                                2

Ankura, and was Managing Director at Chapel Street Capital. Prior to joining Chapel Street Capital, I was a Director in the in the financial restructuring group at Mackinac Partners. I graduated with a BA from Wittenberg University and an MBA from Babson College.

5. I have experience handling complex financial and other restructuring matters for a variety of companies (distressed or otherwise, both in and out-of-court), across a wide spectrum of industries. My areas of expertise include, among other things, (a) advising on financial restructuring strategies, (b) analyzing business plans and related financial projections, (c) advising on liquidity management, and (d) sizing, structuring, raising and executing all aspects of financing transactions, including distressed and debtor-in-possession financings. I have more than 20 years of restructuring related investment banking experience across a wide range of industries.

## ANKURA'S RETENTION

6. Ankura has been engaged as investment banker and financial advisor to the Debtors, and members of my team and I have been working closely with the Debtors, since November 2024. Since being engaged, Ankura has rendered financial advisory and investment banking services to the Debtors in connection with their evaluation of strategic alternatives for restructuring their debt obligations and improving their liquidity and overall financial condition. Additionally, Ankura has worked closely with the Debtors' management and other professionals retained by the Debtors with respect to the Debtors' restructuring efforts and has become acquainted with the Debtors' capital structure, liquidity needs, and business operations.

## THE DEBTORS' NEED FOR DIP FINANCING

7. The Debtors' prepetition capital structure is described in detail in the *Declaration of M. Benjamin Jones in Support of Chapter 11 Petitions and First Day Motions* (the "Jones

Declaration") filed contemporaneously herewith. As noted in the DIP Motion, the Debtors have advised that they require immediate access to additional liquidity to ensure that they are able to continue to operate during the Chapter 11 Cases and preserve the value of their estates for the benefit of all parties in interest. Specifically, based on the Debtors' forecast, the Debtors believe that they will be unable to generate sufficient levels of operating cash flow in the ordinary course of business to cover the projected restructuring costs of the Chapter 11 Cases without "debtor-in-possession" ("DIP") financing.

8. As described in the Jones Declaration, the Debtors commenced these Chapter 11 Cases to provide them with the tools necessary to resolve disruptions to their business as a result of the GETZ Litigation, engage in a restructuring of their balance sheets, effectuate a restructuring transaction that will maximize value for all of the Debtors stakeholders and preserve the Debtors' business as a going concern in the face of an adverse judgment that the Debtors presently cannot satisfy. The Debtors intend to consult with all of their stakeholders, including any statutory committee that is formed in these Chapter 11 Cases, to formulate an exit to the restructuring so the Debtors' business can continue to thrive. The Debtors anticipate that such a decision on the choice of transaction will be decided as soon as possible after the Petition Date, taking into account the views of the Debtors' stakeholders.

## THE DEBTORS' NEGOTIATIONS FOR DIP FINANCING

9. As the challenges posed by the GETZ Litigation as well as the start delays in the Sabine Pass and CP2 Contracts became more extended, the Debtors began to consider various restructuring alternatives to address these issues. On October 30, 2024, the Debtors retained Matthew Kahn to serve as an independent restructuring manager of the Debtors (the "Independent Restructuring Manager"). The Independent Restructuring Manager has been

tasked with evaluating certain claims asserted by GETZ against the Debtors' majority equity investor, Gemini, as well as any financing or restructuring proposals that may be offered by Gemini. Beginning in November 2024, the Debtors, with the assistance of their retained professionals, including Ankura, began a marketing process to attract debt financing for the Debtors.

10. Ankura reached out to over one hundred thirty (130) parties capable of providing DIP financing, with 15 parties signing NDA to evaluate the opportunity. Given the tight timeframe and the intervening holiday schedule, extensive effort was made to secure multiple term sheets (the "Third-Party Term Sheets") for the Debtor to choose between. Ultimately, one Third-Party Term Sheet was secured and the group commenced due diligence.

11. By the end of December 2024, it became apparent to the Debtors and their professionals that they would need to commence the Chapter 11 Case in order to effectively restructuring their balance sheet and operations. Because of short term liquidity constraints, the Debtors had a need for a bridge liquidity solution. On January 3, 2025, the Debtors and Gemini Investors VI, L.P. entered into that certain Term Loan Agreement (the "Gemini Term Loan"). The Gemini Term Loan is a $1 million, one year term loan that is fully subordinated to the obligations arising under the Prosperity Loan Agreement. The obligations under the Gemini Term Loan are secured by subordinated liens on substantially all of the Debtors' assets.

12. During the week preceding the Petition Date the term sheet provider pulled out of the process and Ankura contacted seven groups who had not previously been a part of the process with an additional four NDA's signed. Two of these groups provided Third-Part Term Sheets within two days of being contacted but, given the limited time the Debtors had to guarantee financing to ensure its short-term viability, Gemini put forth its own term sheet. Given

the superior terms of Gemini's DIP Facility proposal, Gemini's knowledge of the Company, and the certainty to close in the timeframe required to provide the Debtors with critically needed liquidity, the Independent Restructuring Manager determined that Gemini's proposal be accepted.

13. Ultimately, the Debtors, in consultation with their advisors, determined that the DIP financing proposal from Gemini reflected terms that were superior to the Third-Party Term Sheets and, in fact, represented the only executable financing transaction available to the Debtors at this time.

## THE PROPOSED DIP FACILITY

14. As set forth in detail in the DIP Motion, the Debtors were able to obtain an agreement on the terms and conditions of a $6 million multi-draw term loan DIP Facility with the DIP Lender, consisting of a $5 million new-money multi-draw term loan facility and a roll-up (the "Roll-Up") of the Gemini Term Loan in an amount of $1 million. As set forth in the DIP Motion, the Debtors are the borrowers under the DIP Facility and are to be secured by a first priority lien on substantially all of the Debtors' assets, subject to customary exceptions. The proposed DIP Facility also requires that the Debtors satisfy certain milestones for progress in the Chapter 11 Cases. Upon entry of the Interim Order, the Debtors will be entitled to draw $2 million of New Money DIP Term Loans. Upon entry of a Final Order, the Debtors will be entitled to draw an additional $3 million of New Money DIP Term Loans and $1 million of Roll Up Loans, which will satisfy the Gemini Term Loan.

### The DIP Facility Was Negotiated in Good Faith and at Arm's Length

15. I assisted the Debtors, together with their other advisors, with the negotiation of the terms and provisions of the DIP Facility.

16. All negotiations between the Debtors, led by the Independent Restructuring Manager, and the DIP Lender, each of whom was represented by reputable counsel and financial advisors, in my view, were conducted in good faith and on an arm's length basis. The DIP Facility was approved by the Independent Restructuring Manager. The Company's management team and legal and financial advisors, including Ankura, were actively involved throughout the process and the negotiations culminated in the agreed upon terms set forth in the proposed DIP Facility.

**The DIP Facility is the Best Postpetition Financing Arrangement Presently Available to the Debtors**

17. Based on my experience with debtor-in-possession financing transactions as well as my involvement in the marketing and negotiation of the various DIP financing alternatives available to the Debtors, I believe that the DIP Facility is the best financing option presently available to the Debtors under the circumstances.

18. First, the DIP Facility will provide the Debtors with immediate access to capital, which the Debtors believe is necessary to provide them the financial flexibility required to effectively and efficiently administer these cases and consider restructuring options.

19. Second, the terms of the DIP Facility are the result of a marketing process, as described above, that enable the Debtors to obtain financing on terms that are usual and customary for such financings. The Debtors, with the assistance of their advisors, including Ankura, solicited and considered other sources of post-petition financing to determine whether the Debtors could obtain DIP financing on better terms and engaged in discussions with five (5) competing parties. Also, notably, no prospective lender, including the DIP Lender, was willing to provide the Debtors with DIP financing on an unsecured or non-superpriority basis.

20. Third, the DIP Lender required the Roll-Up as a condition to their commitment to provide the DIP Facility and to permit the use of Cash Collateral. Also, as set forth in the DIP Motion, the interest rate under the proposed DIP Facility is 2% per annum lower than the interest rate applicable to the Gemini Term Loan.

21. Finally, I believe that the financial terms proposed under the DIP Facility are customary and usual for debtor-in-possession financings of this type. Specifically, the contemplated pricing, fees, interest rate, default rate, and other economic terms of the DIP Facility were all negotiated for at arm's length and are in the aggregate generally consistent with the cost of debtor-in-possession financings in comparable circumstances, particularly for a distressed borrower with an urgent need for liquidity.

I, Matthew Lapish, pursuant to section 1746 of title 28 of the United States code hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: January 13, 2025

                                          */s/* Matthew Lapish
                                          Matthew Lapish
                                          Managing Director
                                          Ankura Capital Advisors